**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROSS L. NELSON, | ) | |
|                Plaintiff, | ) | |
| v. | ) | No. 06 C 1428 |
| UNITED PARCEL SERVICES, | ) | Judge Rebecca R. Pallmeyer |
|                Defendant. | ) | |
| ROSS L. NELSON, | ) | |
|                Plaintiff, | ) | |
| v. | ) | No. 06 C 1898 |
| TEAMSTER LOCAL 705, | ) | Judge Rebecca R. Pallmeyer |
|                Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ross Nelson, an African American born in 1957, was terminated from his employment with the United Parcel Service ("UPS") after refusing what he believes was a demotion and then failing a blood-alcohol test. In his first lawsuit (06 C 1428), Nelson charges UPS with discriminating against him on the basis of his race and age, in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act. In a second suit (06 C 1898), he contends that Teamster Local 705 breached its duty of fair representation and discriminated against him on the basis of race and age by failing to pursue a grievance challenging his discharge. Both Defendants have moved for summary judgment. UPS argues that the undisputed facts show that Nelson's termination was based on his refusal to return to his part-time position after a temporary assignment as a driver. Local 705 argues that the two union officials who made the decision not to pursue Nelson's grievance did so on the basis of their good-faith belief that the union would not prevail, and that neither of them were aware of Nelson's race or age at the time they made the decision.

Because Nelson has not presented evidence from which a reasonable jury could conclude that his race or age were the reason for his discharge, UPS's motion is granted. Because the record is incomplete with respect to Local 705's decision not to pursue Nelson's first grievance, Defendant Local 705's motion is granted in part and denied in part.

## **FACTS**[1]

Plaintiff Ross Nelson is an African-American born on December 20, 1957. (UPS 56.1 ¶¶ 1, 2.) Defendant United Parcel Service ("UPS") is in the business of shipping packages throughout the world. (*Id.* ¶ 3.) From December 3, 2000 until June 11, 2005, Nelson worked for UPS as a part-time unloader and "revenue recovery auditor" at the UPS facility at 1400 Jefferson Street in Chicago, earning $11.35 per hour and working approximately 20-25 hours per week. (*Id.* ¶¶ 6, 10.) A member of Teamsters Local 705, Nelson's employment was governed by a collective bargaining agreement between UPS and Local 705. (*Id.* ¶¶ 8, 9.)

UPS's summer seasonal period runs each year from Easter until the Friday after Labor Day. (*Id.* ¶ 13.) During that period, UPS hires, or temporarily promotes from its part-time staff, package car drivers to replace drivers who are on vacation. (*Id.* ¶ 15.)[2] Beginning on June 13, 2005 and continuing until September 2, 2005, Nelson worked as a "seasonal package car driver," assigned to UPS's facilities in Addison, Illinois and Palatine, Illinois. (*Id.* ¶ 7.) Nelson claims that Ed Label (the

---

[1] Defendant United Parcel Service's Rule 56.1 Statement of Uncontested Material Facts is cited as "UPS 56.1 ¶ ___"; Plaintiff's Response to Defendant United Parcel Services Rule 56.1 Statement of Uncontested Materials Facts is cited as "Pltf.'s 56.1 ¶ ___"; Plaintiff's Local Rule 56.1(b) Statement of Additional Facts is cited as "Pltf's 56.1 Add'l ¶ ___;" and Defendant's Response to Plaintiff's Statement of Additional Material Facts is cited as "UPS 56.1 Resp. ¶ ___." Defendant Teamsters Local 705's Rule 56.1(a)(3) Statement of Uncontested Material Facts is cited as "Local 705 56.1 ¶ ___"; Plaintiff's Response to Local 705's Statement of Facts is cited as "Pltf.'s 705 Resp. ¶ ___"; Plaintiff's Statement of Uncontested Fact in Response to Local 705's Motion is cited as "Pltf.'s 705 Add'l ¶ ___"; and Defendant Teamsters Local 705's Response to Plaintiff's Statement of Additional Facts is cited as "Local 705 Resp. ¶ ___."

[2] With respect to this statement, and several others in the UPS 56.1, Plaintiff has disputed or denied the statement, but cites no evidence to rebut it. In such circumstances, the court deems the statement admitted. *See* Local Rule 56.1.

parties have not provided Mr. Label's title) told him initially that he was being promoted to a position as "full time driver," (*id.* ¶ 14, citing Nelson Dep,, Exh. to UPS 56.1, at 107-08), but it is undisputed that Nelson in fact became a seasonal driver, earning $14.70 per hour, as compared with the full-time driver rate of $15.75 per hour. (*Id.* ¶ 16.)[3] UPS package drivers work a forty-day probationary period, after which they are entitled to seniority in the package car driver position. (*Id.* ¶ 18.) Under the collective bargaining agreement ("CBA") between UPS and the International Brotherhood of Teamsters Local 705, package car drivers hired during the summer seasonal period cannot achieve seniority during the summer season.[4] (*Id.* ¶ 19.) Those who complete the forty-day probation but are returned to their former positions are, however, entitled to be offered the next available openings for package car drivers in the district. (*Id.* ¶ 23.) Nelson knows of no other drivers who were promoted from part-time to full-time (non-seasonal) drivers during the summer of 2005. (*Id.* ¶ 20.)[5]

During the weeks of July 4, July 11, and July 18, 2005, while Nelson was working in UPS's Naperville Center, he was "splitting a route" with another driver and worked less than 8 hours per day and less than 40 hours per week. (*Id.* ¶ 24, citing Nelson Dep. at 61-63.) Other seasonal drivers, including white drivers and drivers under the age of 40, also worked less than 40 hours a week during July 2005. (*Id.* ¶ 27.) Nelson worked longer hours during the last two weeks of June and the last week of July. (*Id.* ¶ 28.) At the end of July, Nelson was invited to take a promotion to a driving position in UPS's Palatine, Illinois facility; he began working there on August 1, 2005. (*Id.*

---

[3] The parties agree that Plaintiff reported certain pay "discrepancies" to his district manager and supervisor (Pltf.'s 56.1 Add'l. ¶ 4, 6); the nature of the discrepancies is not explained, and the matter of Plaintiff's pay rate and benefits as a seasonal driver is not disputed in this lawsuit.

[4] Plaintiff disputes this, but the provision of the CBA he cites appears to support it: "Employees hired to fill vacancies during the vacation period . . . shall not be entitled to seniority." (CBA Article 44, § 1; Exhibit A to Declaration of Tom Haefke.)

[5] Plaintiff disputes this, but the CBA provision he cites (Art. 44) does not rebut it.

¶¶ 30, 31.) Krystin Krause, a white woman, was the manager at that facility; Nelson's division manager, Waring Lester, is a black man born in 1969. (*Id.* ¶¶ 32, 33.) Nelson clams that Ms. Krause told him on August 1, 2005 that he would not get full-time hours, increased pay, or employee benefits. (*Id.* ¶ 34.) In fact, though, during the month of August, he worked as a package car driver at least eight hours a day and more than 40 hours per week. (*Id.* ¶ 35.)

While Nelson was employed at the Palatine Center, he had some performance problems, including regularly misdelivering packages. (*Id.* ¶ 40.) On approximately nine occasions, UPS supervisors rode with him and instructed him on improving his performance. (*Id.* ¶ 41.)[6] UPS routinely reviews the performance of its seasonal drivers near the end of the summer season to decide whether to keep them as drivers or send them back to part-time work. (UPS 56.1 ¶ 43.) As noted, Nelson's driving work was deficient; on September 1, 2005, UPS supervisor Krystin Krause, and UPS human resource manager Gina Curzi met with Nelson and his union steward, Jim Carroll, and informed Nelson that he was being returned to a part-time position as an inventory clerk in the Metro Chicago district. (*Id.* ¶¶ 44-46; Local 705 56.1 ¶ 6.) Nelson refused the part-time position. (UPS 56.1 ¶ 47.) Krause and Carroll disagreed about whether the collective bargaining agreement between Local 705 and UPS allowed UPS to return Nelson to his former position. (Local 705 56.1 ¶ 8.)

Krause contacted UPS's Labor Relations Manager, Tom Haefke, and Haefke told Nelson and Krause by speakerphone that his old part-time position was the only one available to him, and that if he declined it, he would be terminated. (UPS 56.1 ¶¶ 48, 49.) Nelson nevertheless refused

---

[6] Nelson disputes these statements, which are supported by the declaration of the Palatine On-Car Supervisor, Daniel Lagina, but the testimony he cites (Nelson Dep. at 175) refers to his hair color, not to his performance as a seasonal package car driver. Excerpts from Nelson's deposition transcript are attached as an exhibit to his Rule 56.1 Response. Of those pages that are included, the court notes that the page number on page 179 is circled. Perhaps Nelson intended to cite to that page rather than 175; but that page, in which Nelson recounts a conversation in which he rejected Ms. Krause's offer of a part-time work assignment, also does not rebut Defendant's assertion that Nelson had performance problems.

the part-time position, asserting that he had seniority as a full-time driver. At his deposition, Nelson explained that he refused to return to part-time work "because I had made seniority. I had been through my probationary period. I made seniority. I was a full-time package car driver." (Nelson Dep. at 179.) Plaintiff and Local 705 agree that Plaintiff was terminated during this meeting and that "Caroll filed the first grievance regarding his termination at that time." (Pltf.'s 705 Resp. ¶ 10.) Other workers in Nelson's training class who were returned to their former positions before the end of the 2005 season include an Hispanic male born in 1967, an American-Indian male born in 1958, a white female born in 1984, and seven white males born in 1971, 1971, 1972, 1973, 1978, 1982, and 1983. (UPS 56.1 ¶ 51.)

At some point during the morning of September 1, UPS Security Officer Carol Herbord and Human Resources Supervisor Gina Curzi "both felt that Nelson exhibited signs of being under the influence of alcohol" and, pursuant to the CBA, directed that Nelson undergo a "fitness for duty" examination. (UPS 56.1 ¶P 53-55; Pltf.'s 56.1 ¶ 12.) Nelson points out that he had already been discharged at this point, but Haefke explains in his declaration that "Nelson could have changed his mind" and returned to his part-time position. (Plaintiff's 56.1 Resp. ¶ 55, UPS 56.1 ¶ 56, citing Haefke Decl. ¶ 30.) Nelson and Carroll discussed the possibility that Nelson admit that he had a drinking problem and attempt to work out an arrangement with UPS, but Nelson denied having a problem and stated he had not been drinking that day. (Pltf.'s 705 Resp. ¶ 15.) Later that morning, Nelson claims he overheard Ms. Krause making phone calls to various clinics that could conduct the "fitness for duty" examination and commenting to other co-workers, "We are going to fire that nigger today." (Nelson Dep. at 184-185.)

Nelson was taken to Concentra Medical Center for the examination, which included a breathalyser test and urinalysis. (UPS 56.1 ¶ 57.) Though Nelson denies that the test results are accurate or reliable, he acknowledged in his deposition that on six breathalyser tests on September 1, the results showed a blood-alcohol level of .097 at 11:28 a.m., then four test results of

5

"insufficient breath," and then a level of .092 at 11:57 a.m. (Nelson Dep. at 79, 84; Pltf.'s 705 Resp. ¶ 15.) At his deposition, Nelson testified that he never breathed hard enough into the breathalyser to register any result at all. (Local 705 56.1 ¶ 73.) The Collective Bargaining Agreement provides that "any test of an on-duty employee that measures at or above the state mandated DWI level" is a "dischargeable offense." (CBA, Exhibit E to Haefle Decl., Art. 35, § 4.11.1; Local 705 56.1 ¶ 18.) At some point, Nelson requested a blood test, as well, but that request was denied. (Nelson Dep. at 130.)

The following day, at UPS's Palatine facility, Nelson attended a meeting with UPS Supervisor Dale Norris, Kyrstin Krause, Waring Lester, Union Steward Jim Carroll, and Tom Haefke, UPS's Labor Relations Manager. (UPS 56.1 ¶ 72.) Nelson spoke privately with Jim Carroll, who encouraged Nelson to "level with" Haefke and ask for his part-time job back; Nelson refused. (Local 705 56.1 ¶ 21.) Haefke gave Nelson "the opportunity to explain how he failed the breathalyser test" and then made the decision to terminate Nelson, as he had in the case of every employee who tested over .09 on the breathalyser in a "fitness for duty" examination. (*Id.* ¶¶ 74-76, citing Haefke Decl. ¶¶ 39-41.)

Plaintiff, who testified that he has "salt and pepper" hair, claims that Krause referred to him as "Old Silver," and that Division Manager Lester told Nelson on several occasions that other supervisors believed Nelson was "too old, too slow" to succeed as a UPS driver. (Nelson Dep. at 71-72; Pltf.'s 56.1 Add'l. ¶¶ 7-8 .) Nelson did not mention those comments, or Krause's alleged statement of her intention to "fire that nigger today," during the September 2, 2005, meeting nor in his grievances, his charges of discrimination, or his initial complaints in these cases. (UPS 56.1 ¶¶ 81-83, 85-88, 91-92.)

Plaintiff contends that several similarly-situated younger employees were retained after his termination, but the only evidence he cites is a list of employees and their birthdates. (Pltf.'s 56.1 Add'l ¶ 13.) UPS asserts that the employees identified by Plaintiff were seasonal package car

6

drivers, hired after Plaintiff had already been discharged, for the 2005 Christmas season and terminated at its conclusion. UPS notes, further, that one of the workers Plaintiff has identified is older than Plaintiff. (UPS 56.1 Resp. ¶ 13, citing Ritchie Supplement Declaration ¶ 4.)

Jim Carroll filed a second grievance on behalf of Nelson and Local 705 to contest Nelson's discharge after the fitness-for-duty examination. (Local 705 56.1 ¶ 22.) Under the terms of the CBA, a grievance goes first to a union steward, who presents it to management. (*Id.* ¶ 23.) If UPS and Local 705 cannot settle the dispute at this stage, a Local 705 business agent attempts to settle the grievance with management at a meeting or brings it to the monthly Local 705 UPS Grievance Committee. (*Id.*) If the Grievance Committee deadlocks, Local 705 may proceed to arbitration. (*Id.* ¶ 30.) Local 705 prosecuted Nelson's second grievance through all steps of the grievance procedure, including submission to the Grievance Committee, which consists of equal numbers of members selected by UPS and by Local 705. (*Id.* ¶ 24.)

Nelson met with two Local 705 business agents, Jon Clary and John McCormick, to prepare for the presentation of his grievance to the Grievance Committee; he told the agents that the positive alcohol tests were a result of his use of an alcohol-based mouthwash for a dental problem, not because he had used alcohol as an intoxicant. (*Id.* ¶¶ 25-27.) Nelson recalls that Clary and McCormick told him, "we can't help you." (Pltf.'s 705 Resp. ¶ 27.) They made statements about black soldiers who used "Tichenor's mouthwash" to get intoxicated and suggested Nelson must have done so. (*Id.*) They also refused to take medical documents that Nelson brought for them to use in the Grievance Committee Hearing. (*Id.*) At the panel, Clary argued on behalf of Local 705 that Nelson had been suing Dr. Tichenor's mouthwash, resulting in positive breathalyser readings. (Local 705 56.1 ¶ 28.) Plaintiff believes this argument confirms his account, as he himself never mentioned Tichenor's, and that Clary's reference to Tichenor's rather than to generic mouthwash implied that Nelson used it as African-Americans did a century ago, to get drunk. (Pltf.'s 705 Resp. ¶ 28.)

7

After the Grievance Committee panel meeting, Clary told Nelson that if Local 705 chose to take Nelson's case to arbitration, Local 705 would pay for a lawyer and that arbitration would cost approximately $12,000. (Local 705 56.1 ¶ 29.) On September 15, 2005, the Grievance Committee deadlocked on Nelson's grievance. (*Id.* ¶ 31.)

Local 705's attorney, Marilyn Brassil, reviewed the circumstances of Plaintiff's second grievance (the one related to the blood alcohol testing) with Stephen Pocztowski, the Secretary-Treasurer of Local 705 and concluded that Local 705 would be unlikely to succeed in an arbitration of Nelson's grievance. (*Id.* ¶¶ 32, 53.) Her review included a consultation with Clary and McCormick, review of documents, including the language of the collective bargaining agreement, and consideration of the fact that at least three UPS supervisors suspected Nelson of being intoxicated. (*Id.* ¶¶ 37-44.) Her conclusion that arbitration was unlikely to succeed was buttressed by a very recent case in which an arbitrator had upheld discharge on the basis of a positive drug test despite "strong efforts" by Local 705 on the employee's behalf, and an argument that the grievant's obesity caused him to retain evidence of marijuana use longer than an average-weight person. (*Id.* ¶ 54, citing *USF Holland and Teamsters Local Union 705*, 04 AAA 51, 300 00881, Grievance No. 131977, Exhibit I to 705 56.1.) Ms. Brassil believed the fact that the elevated blood alcohol level resulted from mouthwash would not make a difference to an arbitrator. (Local 705 56.1 ¶ 56.) In a February 2, 2006 memo, Ms. Brassil advised Mr. Pocztowski that she recommended against pursuing arbitration on Nelson's behalf. (*Id.* ¶ 57.) In reliance on Ms. Brassil's advice and his own long experience as a UPS employee and Local 705 union steward, business agent, and negotiator, on February 13, 2006, Mr. Pocztowski approved Ms. Brassil's recommendation. Nelson acknowledges that prior to February 13, 2006, neither Ms. Brassil nor Mr. Pocztowski were aware that Nelson was African-American or that he was over 40 years old.

Ms. Brassil notified Nelson of Local 705's decision by letter on February 22, 2006. (*Id.* ¶ 68.) In a February 27 voice mail, a February 28, 2006 letter, and a March 2, 2006 voice mail,

Nelson communicated with Ms. Brassil but made no suggestion that Local 705 acted unfairly on the basis of his race or his age. (*Id.* ¶¶ 69, 70, 71.)

Local 705 has submitted a report from Herbert Leckie, an expert in the technology of alcohol breathalyser examinations. Mr. Leckie states that Nelson's breathalyser results were inconsistent with his contention that they were a product of the use of mouthwash. Had alcohol from mouthwash been present in Nelson's mouth cavity, Mr. Leckie explains, the results of Nelson's first breath test would have been much higher, and the second reading would have been quite different from the first one. (*Id.* ¶ 78.) Mr. Leckie believes that Mr. Nelson's claim that he gave an insufficient breath sample is defeated by the fact that two of his breath samples did generate measurable readings. (*Id.* 79.) Leckie concluded that Plaintiff's challenges to the reliability of the breath test would be easily refuted. (*Id.* ¶ 80.)

## **DISCUSSION**

Plaintiff contends that UPS terminated him on the basis of his race and age and that Defendant Local 705 breached its duty of fair representation. Both Defendants have moved for summary judgment. The court addresses those motions individually.

**Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir.2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court is not required to draw every conceivable inference from the record; however, speculation or conjecture will not defeat a summary judgment motion. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

**UPS's Motion for Summary Judgment**

Plaintiff held a part-time position until the summer of 2005, when he was hired to work as a seasonal package car driver. At the end of the summer season, Plaintiff believed he was entitled to remain in that position. In Plaintiff's case against UPS, it is undisputed that Plaintiff was terminated because, at the end of the 2005 season, he refused to return to part-time work. Plaintiff explains that he "refused because he had seniority." (Pltf.'s 56.1 ¶ 50.) UPS stands by its interpretation of the collective bargaining agreement and its conclusion that Plaintiff was not entitled to a permanent driver position. Even if UPS is mistaken in its understanding, however, Plaintiff has offered no evidence that creates an inference that UPS's decision was motivated by his race or his age.

To create such an inference, Plaintiff is enittled to proceed in one of two ways. Under the direct method, a plaintiff attempting to establish discrimination presents facts that show that his employer's decision to take action against him was motivated by an impermissible factor--in this case, his race or his age. Those facts can be in the form of direct evidence--essentially an admission by the employer that his acts were motivated by the prohibited animus--or circumstantial evidence sufficient to create a "convincing mosaic" that allows a jury to infer intentional discrimination by the decision-maker. *Gusewell v. City of Wood River*, citing *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003). Alternatively, under what is known as the indirect method, Nelson could establish a prima face case of discrimination by showing that (1) he is a member of the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the protected class were treated more favorably. *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the plaintiff's evidence is sufficient for a reasonable jury to find a prima facie case of unlawful discrimination, then defendant must offer a legitimate, non-discriminatory reason for the adverse

employment decision. *Sun v. Board of Trustees of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007); *Ptaskznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). The plaintiff then survives summary judgment if he can demonstrate that the reason articulated by defendant is in fact pretextual. *Ptaskznik*, 464 F.3d at 696.

UPS is entitled to summary judgment under either of these methods of proof. UPS contends that under the plain terms of the collective bargaining agreement, Plaintiff was not qualified to retain the full-time driver position he insists he had earned. The CBA states that a package car driver, who, like Plaintiff, was hired during the summer season, could not earn seniority: "Employees hired to fill vacancies during the vacation period . . . shall not be entitled to seniority." (CBA Article 44 § 1.) Plaintiff disputes this, and Local 705 filed a grievance regarding Plaintiff's removal from the full-time driver position, but neither Plaintiff nor, indeed, Local 705, has explained how UPS's interpretation of this plain language is incorrect.

In any event, for purposes of Plaintiff's race and age discrimination claims, whether UPS is correct in its interpretation makes little difference; so long as UPS managers genuinely believed this interpretation of the CBA, their enforcement of those terms defeats Plaintiff's prima facie case of discrimination. *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368-69 (7th Cir. 1998). Plaintiff does not dispute that he refused to return to his part-time position. He lost the full-time position because Defendant believed he was not entitled to it, not because of his race or his age. Tellingly, Plaintiff himself knows of no other drivers who were promoted from part-time slots to full-time (non-seasonal) posititions during the summer of 2005. Thus, if the court were to reach the fourth prong of Plaintiff's prima facie showing, it would have little trouble concluding that Plaintiff has not identified any similarly-situated employees who were treated more favorably than he.

Plaintiff attemtps to salvage his case by noting comments from unidentified managers that he was "too old, too slow," and references to his graying hair. It was Division Manager Lester, with whom Plaintiff had a good rapport (Nelson Affidavit, Docket No. 64 in 06 C 1989 ¶ 26) who

11

allegedly told Plaintiff about those comments. Assuming these comments were made, they do not create a "convincing mosaic" supporting Plaintiff's age discrimination claim, where there is no evidence that they were uttered by (or heard by) Tom Haefke, who presided at the meeting at which Plaintiff refused to return to the part-time job and was fired. Plaintiff's assertion that he overheard Ms. Krause state her intention to "fire this nigger today" also does not tip the balance. Such an ugly comment has no place in a work setting; but by Plaintiff's own account, it was made after the termination decision had already been made.

All of the drivers who, like Plaintiff, filled in for full-time employees during the summer of 2005 (at least nine of whom were non-black) were returned to their part-time jobs at the end of the 2005 summer season. There is no evidence that any one other than Plaintiff refused the direction to return to the part-time slot. Plaintiff offers no evidence that he was entitled to retain the full-time assignment, beyond his own supposition, and the only purportedly similarly-situated employees he has identified were all hired for the first time after his discharge. Finally, the alleged race- and age-related comments had nothing to do with his termination–which appears from this record to be the result of his own decision.

UPS is entitled to summary judgment.

**Local 705's Motion for Summary Judgment**

A union breaches its duty of fair representation when its conduct toward one of its members is demonstrated to be arbitrary, discriminatory, or in bad faith. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1237, 1243 (7th Cir. 1997). "Insofar as grievances are concerned, 'a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion.'" *Neal v. Newspaper Holdings, Inc.,* 349 F.3d 363, 369 (7th Cir. 2003), quoting *Vaca v. Sipes*, 386 U.S. 171, 191 (1967). This means that, in the context of an employee grievance, the union must conduct some minimal investigation, but the depth and thoroughness of that investigation depends on the particular case, and only an egregious failure to serve the interests of its members amounts to a breach of the

union's duty of fair representation. *Neal*, 349 F.3d at 369 (collecting cases). In considering a claim of breach of the duty of fair representation, courts address the objective adequacy of the union's conduct and consider, as well, the subjective motivation of union officials. *Crider*, 130 F.3d at 1243.

Local 705's motion for summary judgment focuses on its handling of Nelson's second grievance and argues that the undisputed facts show that its processing of Nelson's grievance reflected careful consideration and that its decision not to take that grievance to arbitration was neither arbitrary, discriminatory, nor in bad faith. The court agrees. Though Nelson believes that Local 705's disposition of his grievance was infected by Local 705's knowledge of UPS's purported racial animus (Nelson's Response to Local 705's Motion for Summary Judgment, at 12), the record provides no support for his speculation. First, the union's conduct was objectively adequate: Union officials pursued Nelson's grievance through several steps. Although Plaintiff suggests vaguely that union officials proceeded without taking account of his claim that the test results were invalid (*id.* at 4), the court notes that union advocacy was effective enough that the Grievance Committee was deadlocked. Union counsel then carefully reviewed the case and concluded that it was unlikely to prevail at arbitration. In reaching that conclusion, Attorney Brassil and Secretary-Treasurer Pocztowski took account of the record, Plaintiff's claim regarding the use of mouthwash, the language of the contract, and the union's own recent experience with a grievance arising out of a positive drug test.

Nor is there any basis in this record for a legitimate concern about discrimination or bad faith in the decision not to proceed to arbitration on Plaintiff's second grievance. Plaintiff argues that Local 705 acted improperly to the extent that Ms. Brassil and Mr. Pocztowski took the union's reputation and relationship with the employer into account, but there is nothing improper about their consideration of those matters. A union is not required to take all member grievances to arbitration and "has discretion to act in consideration of such factors as the wise allocation of its own

13

resources, its relationship with other employees, and its relationship with the employer." *Neal*, 349 F.3d at 369, citing *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 691 (7th Cir. 1982). Nor has Plaintiff established that Brassil or Pocztowski held any personal animus. It is undisputed that neither of these decision-makers was even aware of Plaintiff's race or age at the time they reviewed his case and made their decision.

The court concludes that the record is well-developed with respect to the blood-alcohol-level grievance, and that Local 705 is entitled to judgment as a matter of law on Plaintiff's claims arising out of that grievance. The record is far less clear, however, with respect to Plaintiff's initial grievance. Local 705 makes no mention of that grievance in its motion for summary judgment. As discussed earlier, it is undisputed between Nelson and UPS that Nelson was fired even before being sent for alcohol testing when he refused UPS's direction to return to his part-time position. And as between Nelson and Local 705, it is undisputed that a grievance was filed immediately upon that termination, and before the "fitness for duty" examination had even been proposed. Although the record contains evidence suggesting that the two grievances were processed together, Local 705's factual submissions include no explanation for the apparent decision to abandon the first one.

In its reply brief, Local 705 asserts it had a good reason for putting the first grievance aside while it pursued the second grievance: according to a declaration that John McCormick submitted together with Local 705's reply, McCormick and Clary "felt that the breathalyzer grievance was the more difficult case and therefore, if Nelson was not successful on that grievance, the transfer grievance would become moot." Local 705 did not offer this rationale in support of its motion for summary judgment, however, and Plaintiff has had no opportunity to respond to it.

Local 705 also argues that its failure to pursue the first grievance did not result in any injury, as Nelson would have lost his job anyway due to the positive blood-alcohol test – a fair point. It appears to the court that even if the union had pressed forward with that grievance, and Nelson had prevailed, he would have, at best, nominal damages only. This argument, too, however, was not

14

presented in Local 705's original motion for summary judgment, and the court is reluctant to rule in Local 705's favor on the issue without giving Plaintiff the opportunity to respond to it.

With respect to the first termination grievance, Local 705's motion for summary judgment is denied.

## **CONCLUSION**

Defendant UPS's motion for summary judgment (Docket No. 41 in 06 C 1428) is granted. Defendant Local 705's motion for summary judgment (Docket No. 39 in 06 C 1898) is granted in part and denied in part.

ENTER:

Dated: September 30, 2008  _____
REBECCA R. PALLMEYER
United States District Judge